583 So.2d 602 (1991)
STATE of Louisiana
v.
Darryl SPOTVILLE.
No. 90-KA-0907.
Court of Appeal of Louisiana, Fourth Circuit.
June 28, 1991.
Writ Denied September 27, 1991.
Harry F. Connick, Dist. Atty., David L. Arena, Asst. Dist. Atty., New Orleans, for plaintiff, appellee.
Sherry Watters, Orleans Indigent Defender Program, New Orleans, for defendant, appellant.
*603 Before BARRY, WILLIAMS and PLOTKIN, JJ.
BARRY, Judge.
The defendant was convicted of second degree murder, La.R.S. 14:30.1, and sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. He assigns two errors: (1) the State failed to prove his guilt beyond a reasonable doubt; and (2) he had ineffective counsel.
Leonard Hill testified that between 9:30 and 10:00 a.m. on February 18,1989 he was jogging and saw a female body lying on the side of the levee. Detective John Rice arrived at the scene at 10:00 a.m. and saw a white female lying face down. There was blood on both sides of her body and blood several feet away and tire tracks with one heel print on a track.
John Lewis, a bartender at the Bus Stop Lounge, testified that around 4:30 or 5:00 a.m. on February 18 a white female, identified as Darnell Ducoing, the victim, walked into the predominantly black bar, drank two beers and talked to the defendant and Joseph Johnson. The defendant, Johnson, and the victim left the lounge and did not return.
At approximately 7:00 p.m. on February 18, 1989 the defendant was taken into custody and informed of his rights. His parents, Mr. and Mrs. Reah, read him the rights on the arrestee form. Subsequently the defendant gave a statement to Det. Rice and Det. Brinks was present. The mother and father read the statement to the defendant because he was a slow reader. He made two corrections on pages 4 and 6 and signed the statement along with his parents, who noted that the statement was read to the defendant and he understood.
Det. Rice read the statement at trial. The defendant stated that he left the lounge with, Joe (Johnson), Pookie (Willie Curtis), Jimmy Jordan, the victim, and Nikki (Bradford), a black prostitute, and the victim and they went to Jordan's house to smoke rock cocaine. The defendant said the victim agreed to have sex in exchange for cocaine, but she refused. Johnson and the victim exchanged words. The defendant and Jordan went to the rear of the house and Curtis and Johnson stayed in the front with the victim. Soon after the victim went to the back of the house and was naked from the waist down. She went into the bathroom and Jordan followed.
Curtis left and the defendant went to get Johnson's car. When the defendant returned, Johnson and the victim were coming out of Jordan's house. The defendant said the victim told Johnson not to hurt her anymore. Johnson got into the back seat of the car. The victim voluntarily got into the front seat and the defendant drove. The victim gave directions to her house in Metairie. When the defendant took a wrong turn, she became frightened and tried to knife Johnson (where the knife came from was not known). Johnson grabbed her hand and the knife fell to the seat, but the victim kept kicking the defendant and grabbing the steering wheel. The defendant picked up the knife and stabbed her twice in the left thigh. Johnson grabbed the knife from the defendant and stabbed the victim two or three times ("Joe cut her on the chin"). At that point Johnson told the defendant to take the "little road that the water works use" by the levee and stop.
The victim and Johnson got out and the victim tried to run away. The defendant said that he drove away and left the victim and Johnson fighting on the levee. The defendant claimed he did not touch the victim after stabbing her twice in the leg, and did not intend to kill her. The defendant identified Johnson from a photo lineup.
Nikki Bradford testified that she knew the victim as Darnell or Dorcell Ducoing. She said she met the defendant and Johnson at the Bus Stop Lounge and the victim was already with the men. The victim was a little drunk and crying. She told Bradford that she had been dropped off by several men. Ducoing said that the victim gave Johnson $50 for "powder" and he was going to take her home.
Johnson, Bradford, the defendant and the victim got into the car and Bradford suggested going to Jordan's house because *604 he had the paraphernalia to smoke rock cocaine. The group did not use powder cocaine, so Bradford assumed Johnson and the defendant intended to steal the victim's money. She and Johnson left Jordan's house to purchase cocaine and returned. Johnson smoked first and then asked the victim to try some. She smoked and asked to go to the bathroom. Bradford left the house.
Bradford said she, Johnson and Curtis bought the drugs, not the defendant. When the victim went to the bathroom, Jordan and Curtis made sexually suggestive comments but the defendant said nothing. She stated that the defendant and Johnson were known for being together. She said that before they entered the car Johnson took the victim into the alley to tell her something.
Jordan testified that he saw the defendant on and off the night of February 17-18, 1989. The defendant, Johnson, Bradford and the victim went to his house to smoke cocaine in the early morning hours. He testified that the victim was raped by Johnson. He said the defendant did not rape or harm the victim and the victim willingly left with the defendant and Johnson.
Det. Rice testified that he obtained and executed search warrants on Johnson's car and the houses of Johnson and the defendant. In Johnson's car the police found bloodstained blue jogging pants, a bloodstained gold rug, a piece of bloodstained foam, a piece of blue seat material, a blood sample (taken from the doorpost on the passenger side), and a gray metal box with tools.
From the defendant's residence the police recovered a pair of brown leather work shoes and a pair of black and gray pants. From Johnson's residence the police recovered a pair of black jeans, a shirt, a red plastic car dish, a brown leather boot, a white towel and a knife with a brown wooden handle.
Officer Kruebbe examined the 1976 Oldsmobile which was impounded. He found the right front door could only be opened from the outside. Therefore the victim could not get out. Patricia Daniels, medical technologist at the Coroner's office, stipulated as an expert in analysis and identification of body fluids, testified that the victim's blood was type "O".
Officer Sissen, criminalist stipulated as an expert in the examination of body fluids including blood, stated that the pair of brown work shoes in defendant's house tested positive for blood. The defendant's pants and Johnson's jeans and boot indicated type "O" blood. The leaves near the side of the body had "O" blood. The knife and Johnson's shirt had blood. The red plastic car tray and the towel had "O" blood. The jeans of the victim had "O" blood. The foam rubber from the car was stained with blood. The pair of blue pants and gold carpet had type "O" blood.
Dr. James Elson, stipulated as an expert in forensic pathology, testified that he performed an autopsy on the victim. He stated the cause of death was a blunt trauma to her head (which fractured her skull and lacerated her brain) or multiple stab wounds. Dr. Elson testified there were three stab wounds centered around each side of her neck. There were shallow cuts on her left forearm and hands, two cuts on her left thigh and superficial scratches and shallow cuts on her breasts and her back. There was one shallow stab wound on her back. The cuts on her hands and arms could have been defensive. Dr. Elson stated the splattering of blood could have been from the neck wounds or the blow to the head. Below the wound to the head he found a brownish substance which could have been grease. He stated that the back of a heavy knife, a hammer, tire iron, or socket wrench could have been the weapon. The doctor stated that the coroner classified the death as a homicide.
There was a stipulation that the victim's blood had .12 blood alcohol and the presence of cocaine.

ERROR NO. 1

SUFFICIENCY OF THE EVIDENCE
La.R.S. 14:30.1A(1) defines second degree murder as the killing of a human being when the offender has a specific *605 intent to kill or to inflict great bodily harm. La.R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
To be convicted as a principal a person must have the intent required by the statute prohibiting the crime charged. State v. West, 568 So.2d 1019 (La.1990), quoting State v. Holmes, 388 So.2d 722 (La.1980).
To support a conviction as a principal for second degree murder, the State must show that the defendant had specific intent to kill or inflict great bodily harm. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10; State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied ___ U.S. ____, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990).
The State introduced the physical evidence and the defendant's statement as to what happened after the defendant, Johnson and the victim left Jordan's house. The defense is that he did not know Johnson would kill the victim. The defendant argues that the evidence shows that he did not participate in the drug purchase or the sexual intercourse/rape of the victim and the victim voluntarily left with him and Johnson. The defendant admits he inflicted two stab wounds on the thigh, but insists that happened in self-defense when the victim kicked him in the jaw while he was trying to drive. The defendant argues that the fatal wounds were inflicted by Johnson after he drove away.
The State proved that the passenger door of the vehicle could not be opened from the inside and the victim could not get out. The defendant admitted that he stabbed the victim twice and Johnson inflicted two or three stab wounds while the defendant was in the car. The pathologist testified that the cause of death was the knife or head wounds. The defendant drove the victim to the isolated road on the levee after she had been stabbed several times by him and Johnson. He said that when he drove away he could see the victim being chased by Johnson who still had the knife.
The unanimous jury was convinced that the defendant had the specific intent to commit second degree murder. This Court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where the conviction is based on circumstantial evidence, R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Porretto, 468 So.2d 1142 (La.1985); State v. Heck, 560 So.2d 611 (La.App. 4th Cir.1990), writ denied 566 So.2d 395 (1990).
Viewing the evidence in the light most favorable to the prosecution, the jury properly found the defendant had the specific intent to kill Ms. Ducoing or to inflict great bodily harm. There was sufficient evidence to find him guilty beyond a reasonable doubt of being a principal to second degree murder.

ASSIGNMENT NO. 2

INEFFECTIVE COUNSEL
The defendant argues that he should have a new trial because of ineffective assistance of counsel.
He submits that counsel failed to notice his mental limitations and file the appropriate plea and motions. He claims that counsel failed to examine and discover the State's evidence (including a written statement by a witness) and was unprepared for trial.
Those grounds were not clearly specified in the defendant's motion for a new trial. The motion alleged that counsel was overworked, overextended, ill-prepared and under a great deal of distress due to financial and personal problems.
*606 A new claim to support a new trial motion or an objection cannot be raised for the first time on appeal. State v. Berryhill, 562 So.2d 1105 (La.App. 4th Cir.1990). A defendant's claim of ineffective counsel should be considered by an application for post-conviction relief filed in the trial court where an evidentiary hearing may be held. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Reed, 483 So.2d 1278 (La.App. 4th Cir.1986).
The record does not contain a suppression hearing or other transcript which could be considered to determine whether the defendant had ineffective counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Bell, 543 So.2d 965 (La.App. 4th Cir.1989).
We cannot consider this assignment.

ERRORS PATENT REVIEW
A review of the record shows an error patent. The September 12, 1989 minute entry does not show that the defendant waived the twenty-four hour delay between the denial of his motion for new trial and sentencing which is mandated by C.Cr. P.Art. 873. Imposition of sentence without first obtaining a waiver of this delay may constitute harmless error when the defendant does not note the error and does not allege prejudice. State v. Williams, 545 So.2d 1144 (La.App. 4th Cir.1989).
The defendant did not assign the error and does not allege prejudice.
The defendant's conviction and sentence are affirmed.
AFFIRMED.
PLOTKIN, J., concurs with written reasons.
PLOTKIN, Judge, concurring.
The appellant's conviction for second degree murder as a principal can be upheld only if the evidence demonstrates that he had the specific intent to kill or inflict great bodily harm on Ms. Ducoing. In Williams v. Maggio, 695 F.2d 119, 122 (5th Cir.), cert. denied 461 U.S. 917, 103 S.Ct. 1901, 77 L.Ed.2d 288 (1983), the court summarized Louisiana law as follows:
Under Louisiana law one may be convicted as a principal for the crime if he has the requisite mental state. State v. Holmes, 388 So.2d 722, 726 (La.1980). The mental state required for first-degree murder is specific intent to kill or to actively desire the death of, or great bodily harm to, the victim. Holmes, 388 So.2d at 726-27. The specific intent to kill may be inferred from the accused's entire conduct. State v. Butler, 322 So.2d 189, 194 (La. 1975). Such intent might reasonably be implied from the intentional use of a deadly weapon to produce injuries involving serious risks of death. Id.

I believe the jury could reasonably have concluded on the basis of the defendant's own statement presented at trial that the defendant and Johnson were working together to murder the victim. According to the defendant's statement, he was aware that illegal drugs were purchased and used on the night of the murder; in fact, he participated in the use of drugs. Additionally, he knew that the victim either had sexual intercourse with Johnson, or was raped by Johnson, while the group was at Jordan's house, where the illegal drug use occurred. The defendant also knew that the victim had been injured at the house because he stated that the "white girl was saying don't hurt me no more" when she and Johnson got into the car.
Perhaps more importantly, the defendant became an active participant in the crime when he took the responsibility to drive her home just prior to the murder. He stated that he intentionally made a wrong turn, inconsistent with the victim's directions, at which point the victim became hostile and started fighting. Even after the victim objected to the new route and started fighting, the defendant continued in the wrong direction, at Johnson's direction, turning down a road designed for use by utility vehicles. The defendant was, by his own admission, aware that the victim was in danger when she both refused to have sex with Johnson and refused to pay for the drugs she used. Thus, by driving the victim *607 to a deserted location, the defendant was facilitating Johnson's obvious plan to kill or severely injure the victim.
Another indication of the defendant's intent is the fact that he admitted that he personally injured the victim when he stabbed her two to three times in the left leg. Although these wounds were not fatal, this action by the defendant indicates his lack of concern for the victim's safety. Furthermore, the defendant was present in the car as Johnson began to inflict the wounds which would ultimately lead to the victim's death. Certainly by the time Johnson and the victim exited the car, the defendant was aware of Johnson's intent to kill the victim. The defendant testified that the victim was yelling, begging Johnson not to hurt her anymore by this time.
Spotville's intent is also demonstrated by his admitted departure from the scene of an almost-inevitable murder, again at the direction of Johnson; this action constituted a failure to act which assisted in the murder. The defendant left an unarmed, injured woman in a secluded area with an armed, uninjured man chasing her. Prior jurisprudence has established that a failure to interfere with or question the actions of companions who are committing a crime may be considered evidence of intent on the part of the passive defendant. State v. Bates, 495 So.2d 1262, 1269 (La. 1986), cert. denied 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987), quoting State v. Gutter, 393 So.2d 700, 702 (La. 1981).
The defendant's actions, taken as a whole, support the jury's inference that Spotville assisted in the murder and that he had the requisite specific intent to kill or inflict great bodily harm. Therefore, I concur in the majority's decision affirming the conviction.